*In re* MARRIAGE OF JOY LANDFIELD, Petitioner-Appellee, and GEORGE S. LANDFIELD, Respondent-Appellant.

First District (5th Division) No. 1—88—3672

Opinion filed February 8, 1991.—Rehearing denied March 7, 1991.

684

Robert R. Tepper and Lynn M. Esp, both of Rosenthal & Schanfield, of Chicago, for appellant.

Kalcheim, Schatz & Berger, of Chicago, for appellee.

JUSTICE MURRAY delivered the opinion of the court:

George S. Landfield (George) and Joy Landfield (Joy) appeal and cross-appeal respectively from a final decree in a domestic relations case that began over 10 years ago. The issues presented for review are: (1) the trial court's classification of certain property as marital; (2) the property division made by the trial judge; (3) the trial court's valuation of certain property; (4) the maintenance given to Joy; (5) attorney fees awarded; (6) whether section 508 of the Illinois Marriage and Dissolution of Marriage Act (IMDMA) (Ill. Rev. Stat. 1987, ch. 40, par. 101 *et seq.*) provides for the shifting of attorney fees and costs incurred by a spouse to defend against unnecessary litigation; and (7) whether section 102 of the IMDMA is enforceable to provide for a penalty against one of the parties for failure to mitigate damages.

The real precedential value of this case is a demonstration of the failure of the American legislative and judicial system to adequately cope with the marital problems of affluent members of our society in a social system that puts its imprimatur on no-fault divorce.

A history of the case may be of interest to disclose to the organized bar the difficulty the Cook County divorce division encounters with a domestic relations case handled by matrimonial lawyers with great expertise. The case began in 1978 when Joy filed a petition seeking a legal separation or in the alternative a judgment of dissolution of marriage under the IMDMA. (Ill. Rev. Stat. 1977, ch. 40, par. 101 *et seq.*) George filed a counterclaim for dissolution shortly thereafter.

At the time of the filing of the proceedings, George and Joy had been married 28 years and had two children. Both children are adults and no issue of child support, custody or the like was ever involved in this matter. The case was tried three times by three different judges. Two of the judges died before they concluded the trial. A hearing was held before Judge Henry Gentile in 1981. Tragically, Judge Gentile was murdered in his courtroom in connection with another domestic relations action before he was able to rule on this matter. A second hearing was held before Judge Daniel J. Ryan in 1984. Shortly thereafter Judge Ryan's eyesight began to fail him. At that time the Judge Jorzak, chief judge of the domestic relations division, agreed to aid Judge Ryan in ruling. The parties stipulated that Judge Jorzak could decide the case with such consultation with Judge Ryan as may be necessary.

George filed a *mandamus* action with the Illinois Supreme Court seeking to force the judge to conclude the case expeditiously after it had pended seven years. The petition was denied with one judge dissenting. Subsequently, Judge Jorzak was transferred to another division. George

filed another original action in the supreme court. While the second matter was pending, Judge Ryan died before rendering a decision in this case.

The supreme court later entered a supervisory order directing the chief judge of the circuit court of Cook County to expedite a resolution of the matter. The matter was assigned by the chief judge to the present trial judge who immediately scheduled a pretrial conference.

Prior to this appeal, George appealed directly to the Illinois Supreme Court concerning an award of temporary attorney fees to Joy's lawyers. The Illinois Supreme Court dismissed George's appeal as moot, remanding the cause for further proceedings with direction to expedite the complete disposition of the cause. *In re Marriage of Landfield* (1987), 118 Ill. 2d 229, 514 N.E.2d 1005.

The total value of the property involved in the case appears to be well over $2,500,000. According to George's brief, over three-quarters of a million dollars has already been expended in attorney fees. This figure does not reflect any of the fees incurred since the onset of this appeal.

George filed a 144-page brief plus a 69-page appendix. Joy filed an 87-page reply brief and brief in support of her cross-appeal. George filed a 72-page reply brief. The record on appeal fills 11 boxes.

George requests this court to reverse the trial court's order as it relates to the distribution of property, Joy's maintenance and the awarding of attorney fees. George further requests this court to enter its own final order directing that all Joy is entitled out of her 28-year marriage, and this over 12-year case, is an original allowance of $100,000 from George's pension fund made by the trial judge. George also wants the court to assess damages and penalties against Joy's lawyers "not only in equity to both spouses but also to tell the legal community this court will not allow lawyers to 'beat up' litigants by causing them massive legal fees by multiplying proceedings, all to enrich themselves and conform the opposition to their will."

The list of lawyers involved in this case sounds like a who's who among Cook County matrimony lawyers. We prefer to decide the merits of the case and leave the disciplining of lawyers, if warranted, to the Attorney Registration and Disciplinary Committee and the Illinois Supreme Court. We note, however, there is nothing in this record that suggests a violation of any of the ethical rules by any of the lawyers who have been involved in this case.

On the merits, for the reasons set forth below, we affirm in part, and reverse and remand in part.

On appeal, George charges that the trial judge committed a multitude of errors in a various number of the trial court's orders, the final order having been entered on November 30, 1988. Conversely, Joy defends the trial court's final order except to request this court to reverse the trial court's decision as to attorney fees, urging this court to increase the award to the full amount of Joy's fees (*i.e.*, $290,000, in attorney fees plus expert costs of $7,592.57).

George's appeal involves three areas. First, George claims that Joy acquired no marital interest in the considerable property amassed in the 28-year life span of the marriage, save his pension fund. George alleges that the trial court improperly classified numerous items of property as marital rather than nonmarital. He argues that awarding Joy any property was error. George also charges that the trial judge erred in the amount of maintenance awarded Joy. Finally, he argues the award of attorney fees was error.

We shall address these charges in the above order. First the property.

#### PROPERTY

The property involved in the case includes:

1. Considerable stock in a company called the Landfield Company.
2. The Landfield Building Partnership.
3. A residence in Winnetka, Illinois.
4. Furniture in the Winnetka home.
5. An Alfa Romeo automobile.
6. A pension fund.
7. Boats in Winnetka and Phoenix, Arizona.
8. A camper.
9. An airplane.
10. Palm Beach lots.
11. Geneva real estate.
12. Securities.
13. All Savers Certificate.
14. A home in Sedona, Arizona.
15. Insurance policy.
16. Account 20,000.

George claims that all of these assets, save the pension benefits, are nonmarital and he makes the rather aspiring claim in his brief that "Joy Landfield has never been given, or even allowed to hold, *any* property by her husband or in-laws. In fact, this was a constant source of contention during the marriage."

■ Fortunately, in our democratic society the vow of marriage to care for a spouse until death remains a wee bit intact even for the wealthy. Spouses are no longer allowed to deny their mate the right to own property, even if the spouse brings no property into a marriage. A spouse acquires an interest in the property of the other spouse by virtue of the marriage regardless of where so-called legal title actually lies. The State legislature has maintained an iota of the ancient concept that a marriage of two people creates a unity in property by defining the property held by a married couple as "marital property." Ill. Rev. Stat. 1987, ch. 40, par. 503(b).

■ ■ Prior to assigning or dividing property upon dissolution of marriage, the court must classify the property as either marital or non-marital. (*In re Marriage of Durante* (1990), 201 Ill. App. 3d 376, 559 N.E.2d 56.) Any nonmarital property must then be given to the proper spouse. However, section 503(b) of the IMDMA creates a presumption that all property acquired by either spouse after marriage and prior to a judgment of dissolution of marriage is presumed to be marital property regardless of how title is held. (Ill. Rev. Stat. 1987, ch. 40, par. 503(b); *In re Marriage of Rogers* (1981), 85 Ill. 2d 217, 422 N.E.2d 635, 636.) By statute this presumption is rebutted "by a showing that the property was acquired by a method listed in subsection (a) of this Section." Ill. Rev. Stat. 1987, ch. 40, par. 503(b).

■ Illinois law defines "marital property" as "all property" with the exceptions listed below:

"(a) For purposes of this Act, 'marital property' means all property acquired by either spouse subsequent to the marriage, except the following which is known as 'non-marital property':

(1) property acquired by gift, legacy or descent;

(2) property acquired in exchange for property acquired before the marriage or in exchange for property acquired by gift, legacy or descent;

(3) property acquired by a spouse after a judgment of legal separation;

(4) property excluded by valid agreement of the parties;

(5) any judgment or property obtained by judgment awarded to a spouse from the other spouse;

(6) property acquired before the marriage;

(7) the increase in value of property acquired by a method in paragraphs (1) through (6) of this subsection, irrespective of whether the increase results from a contribution of marital property, non-marital property, the personal effort of a spouse,

or otherwise, subject to the right of reimbursement provided in subsection (c) of this Section; and

 (8) income from property acquired by a method listed in paragraphs (1) through (7) of this subsection if the income is not attributable to the personal effort of a spouse." Ill. Rev. Stat. 1987, ch. 40, par. 503(a).

 Marital property must be distributed in just proportions. (Ill. Rev. Stat. 1987, ch. 40, par. 503.) In apportioning the marital property, the court is specifically directed to consider the "value of the property set apart to each spouse." (Ill. Rev. Stat. 1987, ch. 40, par. 503(d)(2).) The distribution of assets rests on the particular facts of each case. (*In re Marriage of Jones* (1989), 187 Ill. App. 3d 206, 543 N.E.2d 119.) George's significant amount of nonmarital property justified an award of most of the marital property to Joy. (See *Atkinson v. Atkinson* (1981), 87 Ill. 2d 174, 429 N.E.2d 465.) A trial court's classification of property will not be disturbed unless contrary to the manifest weight of the evidence. *In re Marriage of Rosen* (1984), 126 Ill. App. 3d 766, 467 N.E.2d 962.

The trial court conscientiously attempted to apply Illinois law by first listing all of the various items of property individually. It then placed a total value on each item of property. In this case that total value was $2,847,964.51. The court then made a determination as to which items of property were marital and which items were nonmarital. The trial court finally concluded that George was entitled to property valued at $2,050,890 ($483,139.50 of marital property and $1,567,750.50 of nonmarital property) and Joy was entitled to marital property valued at $797,074.50. Of all the above items of property listed, the court concluded the following items were marital and distributed them as follows:

| ITEM (CLASSIFIED MARITAL) | VALUE | AWARDED TO: | |
| --- | --- | --- | --- |
| | | JOY | GEORGE |
| Winnetka Home | $450,000 | $450,000 | |
| Winnetka Furniture | 6,000 | 6,000 | |
| Alfa Romeo | 3,500 | 3,500 | |
| Boats | 6,000 | | 6,000 |
| Camper | 1,500 | | 1,500 |
| Pension Funds | 171,585 | 100,000 | 71,585 |
| 854.5 shares L.C. stock | 275,149 | 137,574.50 | 137,574.50 |
| L.B.P. income | 364,980 | 100,000 | 264,980 |
| Insurance | 1,500 | | 1,500 |

Total to Joy of marital property $797,074.50
Total to George including nonmarital property $2,050,890.01

In general the trial judge applied the Illinois concept of marital property correctly, as her final order reflects, by awarding a most substantial portion of the involved property to George, yet at the same time respecting the 28-year contribution of Joy to the marriage. George attacks the specifics of the court's order except its distribution of the pension fund ($71,585 to George and $100,000 to Joy).

### ACCOUNT 20,000

As a preliminary matter, we find it necessary to mention Account 20,000 since questions regarding the account reoccurred throughout the proceedings and references to the account are made throughout this opinion. Account 20,000 is a common cash account used by George and certain related entities. Account 20,000 is comprised of seven subaccounts: the Landfield Company, the Landfield Furniture Division, the Rig-A-Jig Division, George Landfield, Mabel Landfield, the Landfield Building Partnership and Landfield Properties. George testified that deposits were made into Account 20,000 for the benefit of all the subaccount holders.

George utilized his subaccount for personal uses. He did not have another checking account. He deposited his salary and various other funds into his subaccount and he paid the family expenses from this account.

George contends that each subaccount was a discreet account. It is possible that one of the subaccounts could have an overdraft position (a negative cash balance) while the account itself (the sum of all the companies) still shows a positive balance. George maintains that any transfer from one subaccount to another is in fact a loan from one entity to another. There were no formal promissory notes for these loans and they were interest free. Each loan had to be repaid.

George took out loans or created overdrafts within Account 20,000 throughout the marriage. The approval of other subaccount holders was not required in order to create an overdraft within one's account.

### STOCK

During the marriage, George Landfield acquired certain stock in the Landfield Company. The Landfield Company appears to be a closely held Landfield family business which was established by George's father. George is and has been a member of its board. George appears to have been the guiding force behind the business. The Landfield Company has 5,372 shares of stock outstanding. George held legal title to 1,588½ shares. His mother, Mabel Land-

field, and his sister, Terri Cohn, held the balance of the outstanding shares of stock. George does not dispute the value the trial court placed on the stock.

George acquired 223 shares of stock prior to the marriage. The trial court classified these shares nonmarital property and awarded them to George. In 1983 George inherited 511½ shares of stock from his father's estate. This stock was also classified nonmarital property and awarded to George. The remaining 854 shares of stock were acquired during the marriage. The trial judge classified the 854 shares of stock acquired during the marriage as marital property and divided the shares equally between the parties.

George presented the following evidence to the effect that the stock was acquired by gift or in exchange for other nonmarital property. George testified certificate Nos. 19, 28 and 31 (356 shares) represented gifts from his parents. Terri also testified that generally she and George received equal gifts. George also argues that at the trial court's valuation of $100 per share, the amounts of stock so transferred represent approximately the amounts of gifts which could have been given tax free in any one year and as a lifetime exemption. George testified certificates No. 12, 15 and 24 (462 shares) represent a stock dividend. George testified that certificate No. 25 (36 shares) was acquired by George in exchange for a cancellation of a debt owed to him by his mother.

The trial court determined that 854 shares of stock in the Landfield Company were marital property. However, George claims the stock was his nonmarital property because he had acquired the stock by one or more of the exceptions set forth in the IMDMA. (Ill. Rev. Stat. 1987, ch. 40, par. 503(a).) In doing so George equates the Illinois law creating the presumption in favor of defining property acquired after marriage as marital property as an ordinary rebuttable legal presumption. The normal legal presumption is rebutted by evidence sufficient to support a finding by a trier of fact contrary to the presumed fact. There is a good deal of confusion on this general proposition of what evidence, if any, overcomes a presumption, particularly a legislative one. The confusion seems to stem from courts mixing the legal concept of presumptions with inferences. Although used interchangeably in many cases, they are not necessarily the same. A presumption involves a legally recognized relationship between facts. (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §302.2, at 83 (5th ed. 1990).) An inference is a legal factual conclusion based on other facts. (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §302.1, at 81 (5th ed. 1990).) A conclusive presumption is in ef-

fect a rule of law and cannot be rebutted, while other presumptions can be overcome by varying degrees of proof. For example, the presumption in a criminal case that a person is presumed innocent is overcome only by proof beyond a reasonable doubt. The presumption of delivery of an instrument is overcome only by clear and convincing evidence. (*Pure Oil Co. v. Baylor* (1944), 388 Ill. 331, 58 N.E.2d 26.) In most cases a legally rebuttable presumption disappears completely as soon as any evidence to the contrary is produced.

■■■ In discussing the "bursting bubble" theory of presumptions, George refers to the following passage from *McElroy v. Force* (1967), 38 Ill. 2d 528, 232 N.E.2d 708, in his brief:

> "[P]resumptions 'do not shift the burden of proof. Their only effect is to create the necessity of evidence to meet the *prima facie* case created thereby, and which, if no proof to the contrary is offered, will prevail.' [Citations.] *** [T]he presence of a presumption in a case only has the effect of shifting to the party against whom it operates the burden of going forward and introducing evidence to meet the presumption. If evidence is introduced which is contrary to the presumption, the presumption will cease to operate." (*McElroy v. Force* (1967), 38 Ill. 2d 528, 532-33, 232 N.E.2d 708.)

George argues that it is clear he introduced some evidence as to the nonmarital sources of his stock in the Landfield Company and while the presumption shifted to George the obligation of going forward, he met this obligation and the presumption vanishes or the "bubble bursts." However, contrary to George's argument, the presumption that all property acquired after marriage is marital property with certain exceptions does not disappear or cease to operate based only on his testimony of the way he acquired his stock.

■■■ The Illinois Supreme Court has interpreted the IMDMA as creating a rebuttable presumption that property acquired after the marriage is marital; the party seeking the benefit of an exception, including the exception of property acquired by gift, bears the burden of proof. (*Hofmann v. Hofmann* (1983), 94 Ill. 2d 205, 216, 446 N.E.2d 499.) The presumption involving marital property acquired after marriage can only be overcome by clear and convincing evidence. *In re Marriage of Severns* (1981), 93 Ill. App. 3d 122, 416 N.E.2d 1235.

■■■ The Illinois Supreme Court held, in a case of this nature, that a spouse to overcome the presumption must prove not only that the stock acquired after marriage was obtained by him in one of the ways the legislature created an exception for (*i.e.*, gift or inheritance)

but also that the entire stock acquired after his marriage was acquired exclusively by one of the listed methods. (*In re Marriage of Smith* (1981), 86 Ill. 2d 518, 427 N.E.2d 1239.) The trial court in this case did not feel that the stock was issued to George by way of *bona fide* gifts, stock exchanges, and exchanges for overdraws as alleged by George. The trial judge stated, "I find George Landfield has not sustained his burden of proof to rebut the presumption that property acquired after the marriage, this property acquired after the marriage, *** is non-marital property."

The trial court's decision will generally not be disturbed if supported by credible evidence. (*Hofmann v. Hofmann* (1983), 94 Ill. 2d 205, 446 N.E.2d 499.) Notwithstanding the presumption that a transfer from a parent to child is a gift to that child, the trial court's classification of property should not be disturbed unless contrary to the manifest weight of the evidence. *In re Marriage of Rosen* (1984), 126 Ill. App. 3d 766, 467 N.E.2d 962.

Based on the above, this court concludes that the trial court properly applied Illinois law in finding that 854 shares of Landfield Company stock held in George's name were marital property. We uphold the trial court's allocation as to those shares based on such a finding.

### LANDFIELD BUILDING PARTNERSHIP

Next George claims that the classification of the Landfield Building Partnership as marital property was complete error by the trial court. The Landfield Partnership is one consisting of George, his sister, Terri Cohn, and his mother, Mabel Landfield. Prior to his father's death in 1978, the partners consisted of George, his sister and his parents. Upon their father's death, their father's partnership interest passed to George and Terri, creating the following ownership: George (40¼%), Terri Cohn (40¼%) and Mabel Landfield (19½%). The partnership's main asset was a building that was a Chicago landmark, sometimes referred to as the McCarthy building. There was no mortgage on the building and it was valued by the trial court at $1,800,000. The building was theoretically managed and operated by the Landfield Company. In fact it appears that George ran and operated the building on behalf of the partnership. At no time has George ever received a salary from the partnership to manage the Landfield Building. George was, however, employed by the Landfield Company. George's interest in the partnership was acquired prior to the parties' marriage by inheritance, from his father. Joy does not dispute this fact.

Apparently George put all the income earned by the partnership into Account 20,000. The trial court made no determination as to whether the funds in Account 20,000 were marital or nonmarital, but concluded that $364,980 of the account represented partnership income which it classified as marital property. The court awarded $264,980 to George and $100,000 to Joy. We disagree with the trial court's decision and must reverse on this point.

■■ A business property interest owned by one spouse prior to the parties' marriage, such as the partnership here at issue, is nonmarital property and retains its nonmarital classification despite even a significant increase in its value during the marriage. (*In re Marriage of Kamp* (1990), 199 Ill. App. 3d 1080, 557 N.E.2d 999.) Income from nonmarital property is likewise nonmarital if the income is not attributable to the personal effort of a spouse. Ill. Rev. Stat. 1987, ch. 40, par. 503(a)(8).

Joy argues that the trial court's order can be sustained with respect to its classification of the partnership income as marital on a theory of transmutation of property by commingling nonmarital property with marital property (Ill. Rev. Stat. 1987, ch. 40, par. 503(c)(2)) or on a theory of an equitable lien due to George's failure to receive a salary for his management of the Landfield building over the years.

First, Joy argues that pursuant to section 503(c)(1) of the IMDMA, George's previous partnership distributions and current capital account were commingled into newly acquired property, i.e., Account 20,000, which resulted in a loss of identity of the contributing estates. As a result Joy claims the commingled property was therefore deemed transmuted to marital property. Joy further alleges that pursuant to section 503(c)(2) of the IMDMA, George's nonmarital estate is not entitled to reimbursement since George's contributions to Account 20,000 are not traceable with clear and convincing evidence.

■■ We do not believe that the mere fact that George deposited the partnership income into Account 20,000 results in a transmutation. We find that the amount of partnership income was ascertainable and depositing it into Account 20,000 did not result in a loss of identity.

Under an alternate theory, Joy argues that the marital estate is entitled to the imposition of a lien against George's interest in the Landfield Building partnership as a result of the contributions of George's personal efforts in managing the Landfield Building. Joy asserts that since George did not receive a salary for these services, there is no question but that George's efforts in managing the Land-

field Building were significant and resulted in substantial appreciation of his nonmarital property.

■■ Although George was personally responsible for managing the Landfield Building, the partnership's building was actually managed by the Landfield Company. George was employed by and received a salary from the Landfield Company. Section 503(c)(2) of the IMDMA states:

> "[W]en a spouse contributes personal effort to non-marital property, the contributing estate shall be reimbursed from the estate receiving the contribution notwithstanding any transmutation; provided, that no such reimbursement shall be made *** in the case of a contribution of personal effort *** unless the effort is significant and results in substantial appreciation of the non-marital property. Personal effort of a spouse shall be deemed a contribution by the marital estate." (Ill. Rev. Stat. 1987, ch. 40, par. 503(c)(2).)

The correct procedure to be applied under section 503(c)(2) is to determine whether either spouse, petitioner or respondent, contributed significant personal effort toward the partnership which resulted in substantial appreciation of that business. (*In re Marriage of Thornton* (1985), 138 Ill. App. 3d 906, 919, 486 N.E.2d 1288, 1297.) However, it is the appreciation resulting from significant personal effort, not inflation or other factors, external to the marriage, which entitles the marital estate to reimbursement. Ill. Rev. Stat. 1987, ch. 40, par. 503(a)(7).

■■ In the present case George has already received a salary. An appellate court has held that in valuing the right to reimbursement, if respondent's salary is found to be reasonable compensation for his efforts, the nonmarital business need not reimburse the marital estate because respondent's salary during the marriage is marital property and, thus, the marital estate has already been compensated. (*In re Marriage of Morse* (1986), 143 Ill. App. 3d 849, 493 N.E.2d 1088.) The fact that George could have received a higher salary does not mean that he was not adequately compensated.

Additionally, the main asset of the partnership is a building the trial court valued at $1,800,000. It is reasonable to expect that the value of the building (an external factor to the marriage) would cause an appreciation in the value of George's partnership income. There is no evidence as to significant personal effort on the part of George or Joy. There is no evidence that Joy made a contribution to either the Landfield Building Partnership or Account 20,000.

Accordingly, we conclude that the trial court erred in its determination that income from the partnership deposited into Account 20,000 created a transmutation or an equitable lien as now determined by Illinois law. For the reasons set forth above, we must reverse the trial court's determination that the $364,980 of partnership income deposited into Account 20,000 was marital property. The partnership income is nonmarital property and as such should be awarded to George.

### WINNETKA HOME

Next George claims that the trial judge's award of the marital home to Joy was error. Not only does George allege that the home is nonmarital property, he contests the valuation used at the third trial. We reject this contention and affirm the trial court.

The marital home, located in Winnetka, Illinois, was acquired by the parties after marriage. The house in Winnetka was acquired and built from the proceeds of the sale of a home in Lake Forest. The property has been occupied by Joy since 1978. At the time of the final judgment in this case, the property was occupied by Joy and the parties' adult son.

With the exception of a $3,500 contribution by George, the Lake Forest home was a gift. The parties originally lived in an apartment in Chicago. In the early fifties they moved to Lake Forest on property that was a gift from George's father. The property was conveyed to a trust with George as the sole beneficiary. According to George, the title to the property was placed in such a way as to preclude Joy from ever obtaining an interest in the property, even a dower interest.

George's mother Mabel, testified "My husband and I built the house for them." Later in response to a question, "Do you remember precisely to whom it was, to whom you and your husband gave that house[?]" Mabel's response was, "To my son, George. Our son, George."

Ordinarily a transfer from a parent to a child is a gift. However, in this case the presumption is cancelled by the conflicting marital presumption (*In re Marriage of Agazim* (1986), 147 Ill. App. 3d 646, 498 N.E.2d 742; *In re Marriage of Rosen* (1984), 126 Ill. App. 3d 766, 467 N.E.2d 962), the presumption of a gift to a child having been cancelled by the conflicting presumption that all property acquired after marriage is marital property. As a result the trial court, as a finder of fact, was free to determine the issue of whether the marital residence was in fact marital property or nonmarital property without either of the two presumptions.

It is obvious that the trial judge did not find George's position credible, but rather believed his mother's original testimony that the initial home was a gift from both the parents to their son and daughter-in-law. The trial judge stated, "I find the more spontaneous statement to be closer to the truth than her [Mabel Landfield's] later responses to more pointed questions." It is also apparent the trial court felt that the mother's later testimony that the home was a gift solely to her son was the result of affection for her son. On this point the trial judge stated, "I find Mabel Landfield slanted her testimony whenever she thought she could help her son ***." Both George's testimony and his brief make it quite obvious that George would do anything to preclude Joy from obtaining any rights in any property acquired after marriage whether it was marital rights or dower rights.

█ █ It is the function of the trial court to resolve conflicting testimony by assessing the credibility of witnesses and the weight to be accorded their testimony, and this finding will not be disturbed unless it is against the manifest weight of the evidence. (*In re Marriage of Durante* (1990), 201 Ill. App. 3d 376, 559 N.E.2d 56.) This court cannot overturn the decision of the trial court based on the credibility of George tainted by a marriage-long evasion or avoidance of the rights conferred on both spouses by Illinois law and an inference from his mother's testimony that could be taken in either of two ways.

### VALUE OF WINNETKA HOME

George argues that the value found by the trial court for the Winnetka home ($450,000) is not supported by the record. For purposes of the second trial, the parties entered into certain stipulations. Among these were a stipulated value of the Landfield Building and a stipulated value of the Winnetka home.. The stipulated values from the second trial were not restipulated for purposes of the third trial. Joy presented a higher value for the building and George presented a higher value for the Winnetka home. George alleges that the trial court erroneously failed to accept the higher value of the home, although it did accept the higher value for the building.

Joy relied on the stipulation from the second trial placing the value of the Winnetka home at $450,000. The only testimony presented at the third trial regarding the value of the home was from George. George testified that he believed the Winnetka home was presently worth $635,000. Although George cites his qualifications to testify as an expert regarding real estate appraisals, the trial court held that his opinion was admissible as a layman's opinion of the

value of his own property rather than as an expert opinion. George further argues:

> "Once again, the trial court's bias is evident. Having decided that the home was marital and that it would be awarded to Joy Landfield, the trial court simply desired to avoid, to the extent possible, giving Joy much credit for the home. Hence, the finding of a wholly artificial value. While it may have been perfectly human for the trial court to feel sorry for Joy, these emotions ought to have been left outside the courtroom. The result here, as in many other places, is palpably unfair to George Landfield."

■■ We do not find any evidence in the record to support George's accusations of bias on the part of the trial judge nor do we find that the result was palpably unfair to George. The valuation of property is a question of fact. A trial court's determination of value will not be reversed unless it is contrary to the manifest weight of the evidence. (*In re Marriage of Wilder* (1984), 122 Ill. App. 3d 338, 461 N.E.2d 447.) After taking into consideration the values presented by both sides, the fact that George had not been in the house for years and the credibility of the witnesses, the trial court acted within its discretion placing the value of the Winnetka home at $450,000.

### FURNITURE

■■ George concedes that the furniture in the Winnetka home is marital and therefore could be given to either spouse. However, he also states, "the furniture is undoubtedly worth much more in the home than it would be worth on the market as used furniture"; therefore, "the furniture should be given to the spouse who receives the home." Under the circumstances of this case we agree with this proposition and affirm the trial court's award of the Winnetka home furniture to Joy. We find that it was not an abuse of discretion for the trial court to award the Winnetka home furniture to Joy.

### OTHER PROPERTY

■■ The following items were found to be marital property by the trial court. Neither party contests their distribution. The parties owned an Alfa Romeo automobile valued at $3,500 which the trial court awarded to Joy. George had a pension fund from the Landfield Company. His interest accrued only during the marriage. The trial court valued this interest at $171,585 awarding $100,000 of this amount to Joy and $71,585 to George. Between the second and third trials, George purchased a new boat. The trial court found the boat to

be marital, assessing the value at $6,000. The boat was awarded to George. The parties owned an old Winnebago camper valued at $1,500. The camper was found to be marital and awarded to George. George is a part owner of an insurance policy on his mother's life. His interest in the policy was valued at $1,500, found marital and awarded to him.

The trial court found the following items to be nonmarital property. Neither party contests these findings. The Landfield Company owns an airplane. The trial court found this to be property of the Landfield Corporation and thus nonmarital. George Landfield inherited an undivided interest in certain lots in Palm Springs from his father's estate. This interest was found to be nonmarital. George also owned Geneva real estate which housed the Landfield Company's furniture store. This property was also found to be nonmarital. George owns certain securities which were acquired either from his father's estate or from funds the trial court found to be nonmarital. The trial court found these securities including an "All Savers Certificate" to be nonmarital. Between the second and third trials, George purchased a home in Sedona, Arizona. The trial court valued the home at $175,000 and found the Sedona home to be nonmarital.

## DISSIPATION OF ASSETS

■■■ Dissipation of marital assets by one spouse in contemplation of dissolution of marriage is an unacceptable practice. (*In re Marriage of Drummond* (1987), 156 Ill. App. 3d 672, 683, 509 N.E.2d 707.) Dissipation of martial property occurs when a spouse uses marital property for his or her own benefit and for a purpose unrelated to the marriage at a time when the marriage is undergoing an irreconcilable breakdown. *In re Marriage of O'Neill* (1990), 138 Ill. 2d 487, 563 N.E.2d 494.

George admits that he has freely utilized Account 20,000 as his own personal checkbook. Indeed, George has no other personal checking account. George admits that Joy never had any access to Account 20,000. Joy was not authorized to sign checks on Account 20,000 or any other account. The trial court found that $200,000 allegedly borrowed from Account 20,000 was marital and had been dissipated by George. The trial court awarded Joy $110,000 as dissipation of assets, due to George's prior overdraft in Account 20,000.

There was a period of time when George was substantially overdrawn in Account 20,000. The trial court found, "[b]ased on George Landfield's ability to manipulate all the sub-accounts in Account

20,000 \*\*\* I find number one, that the amount due affiliates is not a loan but a transfer of funds to George Landfield."

Whether a given course of conduct constitutes dissipation within the meaning of the IMDMA depends upon the facts and circumstances of the particular case. A determination regarding the dissipation of assets lies within the sole discretion of the trial court and will not be reversed absent an abuse of discretion. (*Head v. Head* (1988), 168 Ill. App. 3d 697, 702, 523 N.E.2d 17.) "The determination of an abuse of discretion does not turn upon whether the reviewing court agrees with the trial court's distribution of assets, but whether the trial judge acted arbitrarily without the employment of conscientious judgment." (*Head,* 168 Ill. App. 3d at 702.) "The dissipating party need not derive a personal benefit from the dissipation in order to be held accountable." (*In re Marriage of Jones* (1989), 187 Ill. App. 3d 206, 233, 543 N.E.2d 119.) A spouse accused of dissipating marital funds has the burden of proving by clear and specific evidence how the funds were spent. *In re Marriage of Smith* (1984), 128 Ill. App. 3d 1017, 471 N.E.2d 1008.

The record supports the trial court's determination regarding dissipation of assets. The record discloses that the trial court's decision was based largely on the credibility of the witnesses and the evidence regarding Account 20,000. We find that the trial court's decision was not an abuse of discretion and affirm the award of $110,000 to Joy as a result of George's dissipation of marital assets.

### MAINTENANCE

The trial court determined that Joy's reasonable needs or expenses were $4,400 per month. The trial court reduced this amount by $400 per month on account of income to be earned from Joy's cash award and by $1,000 for Joy's failure to meet her burden under the rehabilitative maintenance law in this State. The final order required George to pay permanent maintenance to Joy in the amount of $3,000 per month.

Section 504 of the IMDMA sets forth the standard for awarding maintenance. (Ill. Rev. Stat. 1987, ch. 40, par. 504.) It provides that once the court determines that maintenance is appropriate, the amount and duration of the award shall be "as the court deems just" after considering all relevant factors. (Ill. Rev. Stat. 1987, ch. 40, par. 504.) Section 504(b) of the IMDMA provides:

> "(b) The maintenance order shall be in such amounts and for such periods of time as the court deems just, made without regard to marital misconduct and may be in gross or for fixed or

indefinite periods of time and the maintenance may be made from the income or property of the other spouse after consideration of all relevant factors, including:

(1) the financial resources of a party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;

(2) the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

(3) the standard of living established during the marriage;

(4) the duration of the marriage;

(5) the age and physical and emotional condition of both parties;

(6) the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance; and

(7) the tax consequences of the property division upon the respective economic circumstances of the parties." Ill. Rev. Stat. 1987, ch. 40, par 504(b).

"[E]xcept where the financial situation of the paying spouse, the duration of the marriage, or the health of the parties otherwise indicates, section 504(b) requires that the amount of maintenance be sufficient to provide the spouse seeking maintenance with the standard of living established during marriage. The amount of maintenance is reduced by the amount the party seeking maintenance has available to provide herself with this standard of living. The 'needs' referred to in section 504(b) should be construed in light of the standard of living established during the marriage." (*In re Marriage of Thornton* (1980), 89 Ill. App. 3d 1078, 1087, 412 N.E.2d 1336, 1343-44.)

"[A] court should give more consideration to an award of permanent maintenance where *** the marriage was long, the Wife was a homemaker and raised the children and she was unable to establish work skills or further a career." (*In Re Marriage of Ryman* (1988), 172 Ill. App. 3d 599, 613, 527 N.E.2d 18.) The decision to award maintenance is within the sound discretion of the trial court and is dependent on the facts of a particular case. A trial court's decision will not be set aside unless it is contrary to the manifest weight of the evidence, and

an abuse of discretion. *In re Marriage of LaSota* (1984), 125 Ill. App. 3d 37, 465 N.E.2d 649.

At the initiation of this proceeding, the parties were 53 and 49 years old, they had been married 28 years. Joy is now 65 years old. Joy has a high school education. Joy alleges George told her he would always take care of her. George, however, denies this statement. Joy also testified that George had told her he did not desire a wife who was a career woman. During the course of the parties' marriage, Joy was a full-time wife and mother. The last time Joy was employed was in 1950, when she was employed as a dental assistant and technician. George did not allow Joy to own property in her own name. The trial judge stated that considering the parties' substantial means, the parties had maintained a relatively modest lifestyle during the marriage; however, the lifestyle of the parties also included the decision that Joy would not work outside of the home. George's economic circumstances, including his opportunity to acquire assets and income, are superior to Joy's.

In addition to the aforementioned factors, the trial judge considered many other factors enumerated in section 504(b) of the IMDMA: during the marriage many expenses were paid for by the Landfield Company for the benefit of George; George was awarded property well in excess of $2 million; George's income outside of the Landfield Building partnership in the several years preceding the trial court's decision was approximately $85,121 in 1984, $186,000 in 1985 and $187,000 in 1986; George's partnership income increased year by year, and it would not be unreasonable to expect that partnership income to continue to increase; and George's ability to meet his current needs while paying maintenance to Joy.

George argues that because Joy chose to apply for maintenance, she had an affirmative duty to seek gainful employment. (*In re Marriage of Heller* (1987), 153 Ill. App. 3d 224.) After a hearing the trial court found "no proof Joy was incapable of holding a full time job" and reduced the amount of maintenance on account of potential earnings by $1,000 per month due to her failure to meet her burden under the rehabilitative maintenance law. See *In re Marriage of Magnuson* (1987), 156 Ill. App. 3d 691, 510 N.E.2d 437, *appeal denied* (1987), 116 Ill. 2d 556, 515 N.E.2d 111.

■■■ George contends the maintenance award was too high due to the fact that there is no mortgage on the Winnetka home. George asserts that "having a paid-up $450,000 home 'saves' approximately $3,000 per month," thus giving Joy an effective maintenance award of $7,400 (the trial court's award of $4,400 plus the alleged $3,000

savings). We reject George's argument. George fails to point out that at no time during the parties' marriage was the Winnetka home ever encumbered. Joy is receiving the home "free and clear" just as the home was owned "free and clear" throughout the marriage. Although the distribution of marital property is to be considered when determining the amount of a maintenance award, the fact that Joy's ownership of the Winnetka home is unencumbered is not the equivalent of awarding Joy a larger maintenance award.

■■ George even chose to discuss several types of mortgages Joy could take out on her home in order to provide her with an added monthly income. However, the spouse seeking maintenance is not required to sell assets or impair her capital in order to generate income from which she can support herself in the manner enjoyed during the marriage. *Head v. Head* (1988), 168 Ill. App. 3d 697, 523 N.E.2d 17; *In re Marriage of Heller* (1987), 153 Ill. App. 3d 224, 505 N.E.2d 1294.

George argues that the trial court abused its discretion in awarding maintenance. The thrust of George's argument on this point is that Joy was 53 years old in 1978 and has not sought work since the start of the proceedings that year.

George's brief on this point states:

"The facts at bar creates [*sic*] a situation never before squarely considered by this court. A woman who would probably otherwise be entitled to maintenance simply refuses to even seek a job for over ten years. Faced with this situation, this court has three choices.

1. Attempt to guess at what Joy Landfield's income would be if she had not disregarded her affirmative obligation to seek employment;

2. Tell her again that her right to maintenance depends upon employment, and give her a limited period of time within which to seek employment (rehabilitative maintenance); or

3. Enforce the statute in accordance with the language of the cases."

■■ George urges this court to take the last choice. However, we chose a fourth. For the reasons discussed above, we affirm the issuance of permanent maintenance, but reverse and remand the matter to the trial court for a review of the amount of maintenance in light of this court's finding that the trial court erred in classifying the Landfield Building Partnership interest as marital. This error has depleted the award to Joy by $100,000. When this case is finally remanded, if ever, we direct the court to take into consideration the

aforecited factors provided in section 504 of the IMDMA. Ill. Rev. Stat. 1987, ch. 40, par. 504.

### INCREASED TEMPORARY MAINTENANCE

In November 1980, temporary maintenance was fixed as a percentage of George's income. After extensive disputes between the parties as to interpretation of this order, Judge Gentile entered an order providing for temporary maintenance in the amount of $1,500 per month. The temporary maintenance award stayed in effect until after the conclusion of the third trial. At that time the trial judge awarded an increase in maintenance to $2,500 per month retroactive for the prior three years. George has paid that amount. George asks this court to reverse the award of retroactive temporary maintenance and give him credit for the amount he paid.

In 1981 the trial judge found George's income to be $55,000 per year, whereas in the years 1984, 1985 and 1986 George's income (outside of partnership income) averaged $153,000. The trial judge felt that Joy had sustained her burden, showing a change in circumstances between 1981 and 1984, 1985, and 1986. We agree. Joy was able to show an increase in George's income in conjunction with an increased ability to pay. George argues that because Joy was able to get by on $1,500 per month, she could not have reasonable needs in excess of that amount. We do not agree.

We find that the trial court did not abuse its discretion by awarding Joy a retroactive increase in temporary maintenance. Accordingly, we affirm the decision of the trial court on the issue of temporary maintenance.

### ATTORNEY FEES

Section 508 of the IMDMA empowers the trial court to require one party to pay the other party's attorney fees after consideration of the financial resources of the parties. (Ill. Rev. Stat. 1987, ch. 40, par. 508.) The trial court awarded Joy's attorney fees totaling $200,541. The trial court ordered George to pay $100,000 towards Joy's fees. Joy was required to pay the balance of her fees (attorney fees totaling $100,541 plus all of her own expert fees and costs which totaled $7,592.57). Both sides argue that the trial court abused its discretion in the award of fees. George argues that the trial court erred in requiring Joy to pay one half of her own attorney fees. Joy urges this court to find George liable for the full amount of her attorney fees plus costs. George argues that a reasonable fee would be $50,000

and that Joy should pay it. George concludes his argument with the following:

"This court must not allow what has happened here and must assess penalties and damages against these attorneys, not only in equity to both spouses but also to tell the legal community this court will not allow lawyers to 'beat up' litigants by causing massive legal fees by multiplying proceedings, all to enrich themselves and to conform the opposition to their will. If this happened here, imagine the result where the victim had not had the financial resources needed to pursue his position in the courts."

First, this court does not have the power to discipline matrimonial lawyers, that power is vested with Attorney Registration and Disciplinary Committee and the Illinois Supreme Court. Second, nothing in the record indicates that Joy's lawyers violated any law or ethical standard. The problem with this litigation and even this opinion is George's 28-year endeavor to preclude his wife from ever obtaining any interest in the property he acquired after marriage, even dower rights, and conversely, Joy's attempt to get as much of the property George acquired during their marriage as she could. Rather than penalizing lawyers, the legislature could avoid this judicial farce by providing for mandatory arbitration in marital disputes over property. This type of action may not end marital wars over property, but it will place the cost of the battles on the participants, rather than on the taxpayers.

As of now the law in Illinois provides that the allowance of attorney fees and costs in marital actions is not a matter of right, but rests within the sound discretion of the trial court and such an award will not be reversed absent an abuse of discretion. (*Hofmann v. Hofmann* (1983), 94 Ill. 2d 205, 446 N.E.2d 499; *Canady v. Canady* (1964), 30 Ill. 2d 440, 197 N.E.2d 42.) "The factors to be considered in making this determination are: (1) the skill and standing of the attorneys employed; (2) the nature of the controversy, and the novelty and difficulty of the questions at issue; (3) the amount and importance of the subject matter, especially from a family law standpoint; (4) the degree of responsibility involved in the management of the case; (5) the time and labor required; (6) the usual and customary charge in the community; and (7) the benefits resulting to the client." *In re Marriage of Thornton* (1980), 89 Ill. App. 3d 1078, 1093, 412 N.E.2d 1336, 1348.

George argues that "Joy Landfield received, in round numbers, $1,000,000 of property" and thus is capable of paying her attorneys

herself. First, based on the trial court's valuations, Joy received approximately $200,000 less than $1 million and this court has depleted that award by another $100,000. Joy may be left sizeable assets by many people's standards; however, Illinois law is clear on this subject: "A party need not deplete savings or divest herself of assets awarded to her to enable her to pay attorney fees." (*Head v. Head* (1988), 168 Ill. App. 3d 697, 704, 523 N.E.2d 17.) Based on the dissolution that was ordered in this case, the trial court found that while Joy does not have the ability to pay all of her fees, George does have the ability to pay her fees. However, the trial judge also felt that although George has the ability to pay all Joy's fees, Joy has the ability to pay part of her fees.

In reaching her ultimate attorney fees award, the trial judge made certain deductions from the time charged by Joy's attorneys based on, among other matters, computation errors, unspecified entries on time records, abandoned issues and certain casualness in recordkeeping. The trial judge reduced Joy's attorneys' rates to reflect what she felt was "a fair and reasonable rate, based on the experience of the attorneys during that period."

The judge felt that under the current economic circumstances of the parties Joy should pay her own expert fees. Regarding the award of fees, the trial judge stated, "One thing I have taken into consideration are Joy Landfield's cash assets versus George Landfield's cash assets. To the extent, his assets are not actually cash, they are easily liquidated, and he has an extremely large amount of those." The trial judge also took into consideration the amount of maintenance awarded to Joy and that she would be able to use part of the assets awarded to her pursuant to the dissolution, to generate income. In addition, the trial judge considered that Joy was going to have substantial dental bills in the future.

The trial court analyzed the complexity of the case by stating:

"As to the complexity of the issues in this case, I think this is one of those cases that may have appeared, deceptively simple, once all the analyses were made, and all the testimony and documents were organized. However, I find that the case was, factually, very complex. And there were several major issues that lend themselves to different analyses. And it was very difficult. And I know it is much more difficult before it is organized. It was very difficult to organize, I am sure. And the case was certainly unique, to my experience."

We agree with the trial court's analysis of this case.

■■ Nothing in either party's brief or the record suggests that the trial court did not take into consideration the many factors our law requires to be examined in either the amount of the award of fees or its allocation. We do not find that the trial court abused its discretion in ordering George to pay $100,000 of Joy's attorney fees, nor do we find that the trial court abused its discretion in failing to award Joy all of her attorney fees. We specifically find the trial judge's decision to award fees to Joy took into consideration the many factors provided by Illinois statute (Ill. Rev. Stat. 1987, ch. 40, par. 508) and Illinois case law. (*In re Marriage of Thornton* (1980), 89 Ill. App. 3d 1078, 412 N.E.2d 1336; *Gasperini v. Gasperini* (1978), 57 Ill. App. 3d 578, 373 N.E.2d 576.) Accordingly, we affirm the trial court's award of $100,000 in attorney fees to Joy.

### SECTION 508

Section 508(a) of the IMDMA provides a court with the authority to order either spouse to pay a reasonable amount for his own costs and attorney fees or, order the other spouse to pay same. Ill. Rev. Stat. 1987, ch. 40, par. 508.

■■ George accuses Joy's counsel of engaging in "spurious and apocryphal litigation, litigation having no basis in law" and as a result George claims he incurred extensive attorney fees to defend against such litigation. George argues that "[w]hile the language of section 508 does not discuss the issue of fee shifting because of litigants' behavior (rather than inability to pay) it certainly does not preclude such an application of section 508." George requests this court to interpret section 508 to provide for such a result. We deny this request. The record discloses that the parties were equally responsible for causing the exhaustive and protracted litigation.

### SECTION 102

Section 102 of the IMDMA contains a statement of its purposes. Among these purposes are to "mitigate the potential harm to the spouses *** by the process of legal dissolution of marriage" and to "promote the amicable settlement of disputes." (Ill. Rev. Stat. 1987, ch. 40, par. 102.) George claims that "the case was tried with the goal of destroying George Landfield and his will to resist."

George argues that if the policy of the IMDMA is to be upheld and implemented, a cause of action for its violation should exist. Furthermore, George asserts that the conduct of Joy Landfield and her counsel has clearly violated the language of section 102 causing substantial damage to George. George requests this court to hold that

such damage is compensable and order that an appropriate hearing be held on remand. Based on the record, we find this argument destitute of merit.

■■■ George wrote Joy letters attempting to persuade her to abandon the lawsuit and threatening to appeal the trial court's decision. George threatened Joy that she would receive no support or property. Nothing in George's conduct throughout the proceedings, the record, or his brief on appeal leads us to believe that he was victimized throughout the proceedings. Much of the litigation was promoted by the fact that George spent his entire marriage attempting to circumvent the purposes of the IMDMA.

As previously stated, the record discloses that both parties failed to mitigate damages, doing little, if anything, to promote the amicable settlement of this matter. Unfortunately, as in many highly contested divorce proceedings, there was tremendous bitterness and hard feelings on both sides which created a great deal of antagonism and acrimony.

## CONCLUSION

Nothing in the record of this lengthy appeal suggests a clear abuse of the trial court's discretion. As a matter of fact, the trial record discloses a conscientious judge's attempt to apply the law of Illinois in an extremely difficult case. The only error we could find is one instance where the judge followed the spirit of Illinois law rather than the letter of the law.

In conclusion, (1) we affirm the trial court's determination that the Winnetka home was marital property and its award of the home and furnishings to Joy; (2) we affirm the trial court's valuation of the Winnetka home; (3) we affirm the trial court's determination that the stock was marital property and its equal distribution of that asset; (4) we reverse the decision of the trial court that the Landfield Building Partnership interest is marital property; (5) we uphold the decision of the trial court ordering George to pay permanent maintenance to Joy, but reverse and remand so that the trial court may review the amount of the award in light of this court's finding that Joy was not entitled to a portion of the Landfield Building Partnership; (6) we affirm the award of retroactive increased temporary maintenance to Joy; (7) we affirm the trial court's award of $110,000 to Joy as the result of dissipation of assets; (8) we affirm the trial court's award of attorney fees to Joy's attorneys; (9) we decline to interpret section 508 of the IMDMA to provide for the shifting of fees where both parties have been responsible for the extensive litigation; and (10) we de-

cline to interpret section 102 of the IMDMA to provide for a penalty against one of the parties for failure to mitigate damages where neither party acted in a manner which promoted the amicable settlement of the matter.

Affirmed in part, reversed and remanded in part.

LORENZ, P.J.,* and GORDON, J., concur.

---

*Justice Michel A. Coccia participated in this case, but has since recused himself. Justice Francis S. Lorenz was then designated as the third member of the panel and has read the briefs and listened to the oral argument tapes.