*In re* MARRIAGE OF KATHRYN PERLMUTTER, Petitioner-Appellee, and NORMAN PERLMUTTER, Respondent-Appellant.

Second District   No. 2—91—0254

Opinion filed February 10, 1992.—Rehearing denied March 19, 1992.

Mary Ellen Dienes and Winston & Strawn, both of Chicago, and Roger A. White, of Roger A. White & Associates, Ltd., of Lake Bluff (Don H. Reuben, of counsel), for appellant.

Sarane C. Siewerth, Arnold B. Stein, and Timothy M. Daw, all of Schiller, Du Canto & Fleck, Ltd., of Chicago, and Stephen H. Katz, of Schiller, Du Canto & Fleck, Ltd., of Lake Forest (Donald C. Schiller, of counsel), for appellee.

JUSTICE BOWMAN delivered the opinion of the court:

Respondent, Norman Perlmutter (Norman), appeals from several orders entered by the circuit court of Lake County relating to

issues surrounding the dissolution of his marriage to petitioner, Kathryn Perlmutter (Kathryn). Norman alleges the following instances of error: (1) the trial court's classification and valuation of marital and nonmarital property was improper; (2) the court's distribution of marital property was improper; (3) the court's child support award was excessive and therefore improper; and (4) the court, as evidenced by various acts and orders, was biased and prejudiced against Norman.

The parties were married on January 20, 1978, and had two children during their marriage. Kathryn filed her petition for dissolution of marriage on October 21, 1987. After a lengthy trial, the trial court rendered a written letter opinion on July 27, 1990, and entered a written judgment of dissolution in conformity with the letter opinion on September 12, 1990. The court in its September 12 order also granted leave to the parties to file petitions for attorney fees. On October 10, 1990, the trial court amended its September 12 order and otherwise denied the parties' post-trial motions to reconsider. On October 12, 1991, Norman filed a notice of appeal from the orders of September 12 and October 10. This court, on October 30, 1990, dismissed Norman's appeal for want of a final and appealable order. On February 28, 1991, pursuant to and in conformance with a written letter opinion, the trial court entered an additional money judgment against Norman for attorney fees and sanctions. Norman filed his notice of appeal on the same day. Kathryn also filed a notice of cross-appeal, but she has not pursued the matter.

The total value of the property involved in this case appears to be well over $20 million. The record on appeal fills eight boxes. Due to the nature of the case, and due also to the fact that Norman has provided us with an argumentative statement of facts (see 134 Ill. 2d R. 341(e)(6)), we will summarize those facts necessary to resolve the issues presented as those issues are addressed.

We first consider Norman's contention that the trial court's classification and valuation of certain marital and nonmarital property was improper. Section 503 of the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1989, ch. 40, par. 503) sets forth the guidelines to be consulted in determining whether property is classified as marital or nonmarital. In this regard, section 503 provides in pertinent part as follows:

"§503. Disposition of property. (a) For purposes of this Act, 'marital property' means all property acquired by either

spouse subsequent to the marriage, except the following, which is known as 'non-marital property':

(1) property acquired by gift, legacy or descent;

(2) property acquired in exchange for property acquired before the marriage or in exchange for property acquired by gift, legacy or descent;

(3) property acquired by a spouse after a judgment of legal separation;

(4) property excluded by valid agreement of the parties;

(5) any judgment or property obtained by judgment awarded to a spouse from the other spouse;

(6) property acquired before the marriage;

(7) the increase in value of property acquired by a method listed in paragraphs (1) through (6) of this subsection, irrespective of whether the increase results from a contribution of marital property, non-marital property, the personal effort of a spouse, or otherwise, subject to the right of reimbursement provided in subsection (c) of this Section; and

(8) income from property acquired by a method listed in paragraphs (1) through (7) of this subsection if the income is not attributable to the personal effort of a spouse.

(b) For purposes of distribution of property pursuant to this Section, all property acquired by either spouse after the marriage and before a judgment of dissolution of marriage or declaration of invalidity of marriage, including non-marital property transferred into some form of co-ownership between the spouses, is presumed to be marital property, regardless of whether title is held individually or by the spouses in some form of co-ownership such as joint tenancy, tenancy in common, tenancy by the entirety, or community property. The presumption of marital property is overcome by a showing that the property was acquired by a method listed in subsection (a) of this Section." (Ill. Rev. Stat. 1989, ch. 40, pars. 503(a), (b).)

A trial court's classification of property as marital or nonmarital will not be disturbed unless contrary to the manifest weight of the evidence. *In re Marriage of Landfield* (1991), 209 Ill. App. 3d 678, 689.

The trial court, in its July 27, 1990, letter opinion and September 12, 1990, judgment of dissolution, classified and distributed the parties' property as follows:

ITEM

| Classified Nonmarital | VALUE | AWARDED TO |
|---|---|---|
| Finley Company Stock Proceeds | $ 2,309,799 (less $28,000 reimbursement to marital estate) | Kathryn |
| Sumac Residence | No assigned value | Kathryn |
| Jewelry | No assigned value | Kathryn |
| Egandale Residence | $ 2,800,000 | Norman |
| Wau Account | $ 475,000 | Norman |
| Sikes Account | $ 515,000 (less $427,000 reimbursement to marital estate) | Norman |
| Sikes Partnership Interest | $ 131,000 | Norman |
| La Salle Lake Investors Partnership | $ 33,000 | Norman |
| Ferrari Automobiles | $ 325,000 | Norman |
| Artwork | $ 49,500 | Norman |
| Chris Craft Stock | $ 251,770 | Norman |

ITEM

| Classified Marital | VALUE | AWARDED TO |
|---|---|---|
| Scott Street Residence (and forgiveness from $911,000 note) | $ 1,150,000 | Kathryn |
| Snowmass Residence (subject to $987,000 mortgage) | $ 2,200,000 | Kathryn |
| Midtown Bank Account | $ 175,213 | Kathryn |
| Midtown Bank Account | $ 560,060 | Kathryn |
| Mayfair Investment Account | $ 543,000 | Kathryn |
| Certain artwork | $ 65,000 | Kathryn |

| | | |
|---|---|---|
| Forgiveness of obligation to reimburse marital estate | $ 28,000 | Kathryn |
| Various automobiles | No assigned value | Kathryn |
| Slope 103 | $ 13,000 | Norman |
| UTV Stock | $ 70,000 | Norman |
| Certain artwork | $ 44,000 | Norman |
| B. Perlmutter loan | $ 35,000 | Norman |
| Interest in Heitman Financial, Ltd. | $ 4,420,000 | Norman |
| Interest in Mayfair Regent Hotel (New York) | $ 6,350,000 | Norman |
| Interest in remaining assets of HC Partnership | No assigned value | Norman |
| Forgiveness of obligation to reimburse marital estate for dissipation | $ 1,127,193 | Norman |
| Forgiveness of obligation to reimburse marital estate from Sikes account | $ 427,000 | Norman |
| Forgiveness of obligation to reimburse martial estate for improvements to Egandale residence | $ 1,633,569 | Norman |
| Sheridan Road Condominium | No assigned value | Norman |
| Interest in sailboat | No assigned value | Norman |
| Various automobiles | No assigned value | Norman |

The trial court, in order to achieve a 40% distribution of marital assets to Kathryn, then ordered Norman to pay to Kathryn the sum of $3,415,000, plus interest at the rate of 9% per annum. The court stated that Kathryn would be responsible for the mortgage on the Snowmass condominium. In its October 10, 1990, order, however, the trial court amended its September 12 judgment order to the effect that Norman would be responsible for the Snowmass mortgage and

further that the $3,415,000 due to Kathryn from Norman would be reduced accordingly to $2,415,000.

Specifically, Norman contends that the trial court erred in the classification and valuation of certain property when it (1) found that his interest in H.C. Partnership was marital property; (2) found that, even if Norman's interest in H.C. Partnership was nonmarital, the individual assets of the partnership would qualify as marital property; (3) accepted Kathryn's experts' appraisal values for Heitman Financial, Ltd., and the New York Mayfair Regent Hotel; and (4) found that funds in various investment accounts were Kathryn's nonmarital property.

Norman first contends that H.C. Partnership was formed prior to the parties' marriage and, therefore, his interest in H.C. is nonmarital. Kathryn argues that the partnership was not formed until after the parties were married, in 1978, as evidenced by the fact that the partnership did not file a tax return for 1977, and the 1978 tax return failed to show any money in any partners' capital accounts.

Testimony at trial indicated that, when Norman met Kathryn on September 1, 1977, he was the chief executive officer of Heitman, a real estate company. At that time, Norman was on the board of directors of Cordura Corporation, a New York stock exchange company that owned Heitman. Norman was also on the board of directors of Chris-Craft Industries. The day after Kathryn met Norman, Cordura publicly announced that it was selling Heitman to a group of investors, including Norman. Norman had originally purchased Heitman in 1966, but sold the company to Cordura in 1969.

In the fall of 1977, Norman led a group consisting primarily of Heitman management individuals to repurchase Heitman from Cordura. Negotiations began in June 1977, and Cordura in September 1977 made a public disclosure of the impending sale. The transaction closed in November 1977, with Cordura announcing the consummation of the sale and filing the required SEC reports. As the trial court found, H.C. Partnership was initially formed, in 1977, to acquire stock in Heitman Financial Services, Ltd., the corporation which purchased the Heitman Group from Cordura. Heitman's acquisition was structured as a purchase of assets. Heitman Financial, Ltd., acquired Heitman's assets from Cordura and continued the business. The purchase price was $10,250,000. $250,000 of the purchase price was paid in cash to Cordura by the new stockholder group. The new Heitman corporation paid Cordura the remaining $10 million with a Heitman corporate note. The $10 million corporate note was secured by a pledge of the acquired assets.

In support of his position that H.C. was a partnership in which he obtained an interest prior to the marriage, Norman introduced a stock certificate representing shares of stock issued by Heitman Financial Services, Ltd., in November 1977 to H.C. and a copy of a partially executed H.C. partnership agreement dated November 4, 1977. In May 1978, after the parties' marriage but prior to any marital discord, the H.C. partners executed an amendment to the H.C. Partnership agreement that contained a recital stating that the original agreement had been executed on November 4, 1977. After the parties' marriage, H.C. acquired other investments in addition to Heitman, such as the Mayfair Regent Hotel in Chicago, the Mayfair Regent Hotel in New York, real estate ventures known as Wilshire Normandie, La Salle Arcade, MAF Associates, and a condominium apartment in Snowmass Village, Colorado, known as Slope 103.

Regarding the classification of H.C. Partnership, the trial court, in its July 26, 1990, letter opinion, stated as follows:

> "H.C. Partnership is an investment partnership. It was initially formed to acquire stock in HFSL, the corporation which purchased the Heitman Group from Cordura prior to the marriage. A stock certificate representing shares of stock issued by HFSL in November, 197[7] to H.C. and a copy of a partially executed H.C. partnership agreement were produced by Mr. Perlmutter in support of his position that H.C. was a partnership in which he obtained an interest prior to the marriage. Nevertheless, the existence of H.C. as an operating entity was not established until sometime in 1978 after the marriage. Mr. Perlmutter has not met his burden of proving that he has a nonmarital interest in H.C. and its assets."

We agree with Norman that his interest in H.C. Partnership is nonmarital property. In Illinois, the existence of a partnership relation is a question of intent to be gathered from all the facts and circumstances. (*In re Marriage of Kamp* (1990), 199 Ill. App. 3d 1080, 1083.) In *Kamp*, the evidence indicated that a partnership known as Kamp Brothers was in existence prior to 1981, when the parties in that case were married. The evidence also indicated, however, that the brothers' agreement was oral and that they did not file tax returns for the partnership prior to 1981. Nevertheless, the court concluded that "the mere fact that the brothers had not entered into a formal written partnership agreement or filed Federal partnership tax returns prior to 1981 does not defeat a finding that a farming partnership existed prior to the parties' marriage." (*Kamp*, 199 Ill. App. 3d at 1083.) We believe the situation here to be analogous and

likewise conclude that the alleged defects noted by Kathryn do not require a finding that H.C. Partnership did not exist prior to the parties' marriage. Based on the facts and circumstances surrounding the formation of H.C., as related above, we conclude that the partnership was in existence prior to the parties' marriage in 1978.

We also note that the trial court itself found that H.C. was "initially formed to acquire stock in HFSL, the corporation which purchased the Heitman Group from Cordura *prior to the marriage.*" (Emphasis added.) However, the trial court concluded by stating that, "Nevertheless, the existence of H.C. as an operating entity was not established until sometime in 1978 after the marriage." The trial court's statements in this regard are inconsistent and, we believe, irreconcilable. If, as the trial court found to be the case, H.C. acquired stock in HFSL, which in turn purchased Heitman *prior to the marriage,* H.C. clearly had to be established and in existence as some form of operating entity to do so. Neither Kathryn nor the trial court provides any relevant authority for the proposition that H.C. was not an "operating entity" prior to the parties' marriage, and we find the court's conclusion to that effect contrary to the manifest weight of the evidence.

Norman also contends that the trial court erred in concluding that his interest in individual partnership assets was marital property. In this regard, the trial court stated as follows:

"Even were the interest in H.C. found to be nonmarital, the individual assets would still qualify for treatment as marital assets. With regard to HFSL the evidence is convincing that significant personal effort during the marriage was contributed by Mr. Perlmutter resulting in a substantial appreciation of the asset. Given the fact that the asset had a zero equity at the time of acquisition having been acquired totally with borrowed funds, the only feasible method of reimbursement is to include the total value of the asset in the marital estate. It is also significant to note that the borrowed funds were paid back during the marriage. The funds used to pay off the loan consisted of income admittedly from a nonmarital asset but attributable to the personal efforts of Mr. Perlmutter.

With regard to the other assets held by H.C. Partnership, the classification of H.C. as either a marital nor [sic] nonmarital nonmarital [sic] is not controlling on the classification of the assets it holds. H.C. is a holding company. Each asset it holds must be analyzed separately. Having been acquired after

marriage and not falling into any of the nonmarital exceptions, the following assets are marital property:

a) New York Mayfair Regent

b) Chicago Mayfair Regent for which no credible value was established and which is awarded to Mr. Perlmutter

c) Slope 103 valued at $13,000.00

d) The Mayfair deal account containing $543,000.00."

■ First, we disagree with the trial court's finding that Norman's interest in Heitman qualifies as a marital asset. As stated earlier, the trial court initially found that H.C. Partnership was formed to acquire stock in HFSL, which in turn purchased the Heitman Group prior to the marriage. This finding seems to indicate that the trial court considered Heitman to be a nonmarital asset. The court goes on, then, to conclude that, due to Norman's "significant personal effort," the "only feasible method of reimbursement is to include the total value of the asset in the marital estate." Such a conclusion, even if valid, also would indicate that Norman's interest in Heitman is nonmarital. This is so since, if the asset was marital, there would be no need for the trial court to address the issue of reimbursement to the *marital* estate.

Section 503(c)(2) of the Act, which sets forth the guidelines for determining reimbursement, provides as follows:

"(c) Commingled marital and non-marital property shall be treated in the following manner, unless otherwise agreed by the spouses:

***

(2) When one estate of property makes a contribution to another estate of property, or when a spouse contributes personal effort to non-marital property, the contributing estate shall be reimbursed from the estate receiving the contribution notwithstanding any transmutation; provided, that no such reimbursement shall be made with respect to a contribution which is not retraceable by clear and convincing evidence, or was a gift, or, in the case of a contribution of personal effort of a spouse to non-marital property, unless the effort is significant and results in substantial appreciation of the non-marital property. Personal effort of a spouse shall be deemed a contribution by the marital estate. The court may provide for reimbursement out of the marital property to be divided or by imposing a lien against the non-marital property which received the contribution." Ill. Rev. Stat. 1989, ch. 40, par. 503(c)(2).

The correct procedure to be applied under section 503(c)(2) is to determine whether either spouse, in this case Norman, contributed significant personal effort toward the nonmarital business asset which resulted in substantial appreciation of that business. (*In re Marriage of Landfield* (1991), 209 Ill. App. 3d 678, 695; *In re Marriage of Kamp* (1990), 199 Ill. App. 3d 1080, 1085.) The parties do not generally dispute either that Norman contributed significant personal effort toward Heitman or that that effort contributed to a substantial appreciation of the business. Thus, initially at least, it would seem that reimbursement to the marital estate is warranted. However, it is also true that, in valuing the right to reimbursement, if Norman's Heitman salary is found to be reasonable compensation for his efforts, the nonmarital business need not reimburse the marital estate because Norman's salary during the marriage is marital property, and, thus, the marital estate has already been compensated. (*Landfield*, 209 Ill. App. 3d at 695; *Kamp*, 199 Ill. App. 3d at 1085; *In re Marriage of Morse* (1986), 143 Ill. App. 3d 849, 855, citing Feldman & Fleck, *Taming Transmutation: A Guide to Illinois' New Rules on Property Classification & Division Upon Dissolution of Marriage*, 72 Ill. B.J. 336, 344 (1984).) In addition, the fact that Norman could have received a higher salary, as implied by Kathryn, does not mean that he was not adequately compensated. *Landfield*, 209 Ill. App. 3d at 695.

Kathryn attempts to distinguish *Morse* and *Kamp* on the basis that in those cases the reviewing court remanded for additional evidence on the question of whether the husband's compensation from a nonmarital business was adequate compensation to the marital estate. However, Kathryn notes that Norman commonly receives in excess of $1 million in compensation, and she has never seriously suggested that Norman is undercompensated. To the contrary, Kathryn's valuation expert testified to the effect that Heitman executives, including Norman, were actually overcompensated. Based on these considerations, we conclude that Norman's Heitman salary was in fact reasonable compensation for his efforts. As such, the marital estate has also already been compensated, and the trial court's finding that the marital estate is entitled to reimbursement for the full value of Norman's interest in Heitman, based on his personal efforts, was against the manifest weight of the evidence.

In concluding that Heitman qualified as a marital asset, the trial court also found that the funds used to pay off the Heitman loan "consisted of income admittedly from a nonmarital asset but attributable to the personal efforts of [Norman]." In this regard, the trial

court was apparently attempting to follow section 503(a)(8) of the Act, which states "income from property acquired by a method listed in paragraphs (1) through (7) of this subsection if the income is not attributable to the personal effort of a spouse" is nonmarital property. (Ill. Rev. Stat. 1989, ch. 40, par. 503(a)(8).) However, the rule in this section has been said to be "consistent with prior decisional law which established that income in the form of *earnings from employment* received during marriage is marital property." (Emphasis added.) Ill. Ann. Stat., ch. 40, par. 503(a)(8), Supplement to Historical & Practice Notes, at 63 (Smith-Hurd Supp. 1991), citing *In re Marriage of Fleming* (1980), 80 Ill. App. 3d 1006.

Roger Smith, the chief financial officer of Heitman, testified that, between December 31, 1978, and December 31, 1979, the Cordura note was reduced from $10 million to $336,875. In response to question from Kathryn's counsel, Smith stated that the $10 million "was primarily paid out of the [Heitman] assets which were in existence at the date that Heitman Financial Services [was] acquired." The evidence at trial allowed the trial court to conclude that the Cordura note was paid either "primarily," or at least in part, from the sale of Heitman assets and investments and not solely from Norman's income in the form of earnings from employment. Accordingly, the trial court's failure to consider these other means of repayment, and its apparent conclusion that the loan was paid off entirely from Norman's income, was contrary to the evidence.

Finally, even if some portion of the Cordura note was repaid with marital funds, "nonmarital property is not transmuted into marital property merely as the result of the use of marital funds to reduce the indebtedness." (*In re Marriage of Leisner* (1991), 219 Ill. App. 3d 752, 763; see also *In re Marriage of Crouch* (1980), 88 Ill. App. 3d 426, 430.) To the extent that the marital estate should be reimbursed for contributions made to reduce the Cordura note stemming from Norman's employment income, we leave that issue to be determined on remand.

To summarize, the trial court basically concluded that Heitman qualified as marital property for two reasons. First, it found that Norman's significant personal efforts resulted in the substantial appreciation of the asset. Second, it found that the funds used to pay off the loan consisted entirely of income attributable to the personal efforts of Norman. We have found these conclusions to be against the manifest weight of the evidence, and, accordingly, we reverse the trial court's finding that Heitman was marital property.

374

We agree, however, with the trial court's finding that the other assets of H.C. Partnership, acquired after the parties' marriage, constitute marital property. The cases cited by Norman in support of his argument that the trial court erred in analyzing assets of the partnership separately are inapposite. In both *In re Marriage of Weiss* (1984), 129 Ill. App. 3d 166, and *In re Marriage of Wilson* (1982), 110 Ill. App. 3d 809, the reviewing courts were addressing the proper method of valuing a partnership. Those cases were not concerned with the classification of a partnership or its assets as marital or nonmarital property.

Similarly, in *In re Marriage of Landfield* (1991), 209 Ill. App. 3d 678, *In re Marriage of Kamp* (1990), 199 Ill. App. 3d 1080, and *In re Marriage of Wilder* (1983), 122 Ill. App. 3d 338, cited by Norman, the courts were concerned with section 503(a)(7) of the Act, which provides that an increase in the value of nonmarital property remains nonmarital property, subject to reimbursement to the marital estate. (Ill. Rev. Stat. 1989, ch. 40, par. 503(a)(7).) Those cases did not address, and the question was not at issue, whether specific assets of a partnership, acquired after the marriage, would be classified as marital or nonmarital property.

Instead, we believe the case law relied upon by Kathryn to be more closely analogous to the specific issue at hand. In *In re Marriage of Kennedy* (1981), 94 Ill. App. 3d 537, the primary property-related issue concerned the disposition of the husband's music store business. Title to the music stores was in several corporations in which the husband held most of the stock. In classifying the business, the court held that the stores the husband owned before the marriage, including the increase in value of those stores, were the husband's nonmarital property. *Kennedy*, 94 Ill. App. 3d at 547.

After the parties were married, however, the business expanded, and the husband acquired additional stores. With regard to these stores, the court stated:

"The stores acquired after the marriage are new and distinguishable property; we do not regard them as mere 'improvements' to the old stores (or the corporations or 'the business'). The new property is marital. It does not come under any exception to the rule that property acquired during the marriage is marital." (94 Ill. App. 3d at 548.)

The court also added, "The stores are sufficiently separable so that there is no practical necessity to treat them as a unit." 94 Ill. App. 3d at 548.

■ Similarly, we consider the assets acquired by H.C. after the parties' marriage to be new and distinguishable property. All of the assets are sufficiently separable and distinct from one another, and their acquisition clearly constitutes more than an "increase in value" in H.C. Therefore, these remaining H.C. assets, having been acquired after the parties' marriage, and not shown by Norman to be among the nonmarital exceptions listed in sections 503(a)(1) through (a)(6) of the Act, were properly classified by the trial court as marital property.

■ Norman also argues that the trial court erred in accepting Kathryn's experts' appraisal values for Heitman and the New York Mayfair Regent Hotel. With regard to Heitman, Kathryn presented the expert testimony of Gregory Vlasak, a senior vice-president and officer of Duff & Phelps Financial Consulting Company. Vlasak concluded that the total equity value of Heitman was $50 million to $55 million. In reaching this figure, Vlasak utilized two primary methods of valuation, a discounted cash flow approach and a comparable company approach. Norman did not present any expert testimony or evidence regarding the value of Heitman.

To verify the discounted cash flow analysis, Vlasak compared Heitman to 11 other companies that provide investment advisory services. When Vlasak compared Heitman's compensation figures to those of the other publicly traded companies, he concluded that the overall figures for Heitman's top executives were higher than those for executives in the comparable companies. In an attempt to reach what Vlasak considered to be a reasonable and competitive compensation level, he then added back to Heitman's value $2 million to $3 million representing monies that in public companies would have been distributed to shareholders as dividends rather than to executives as bonuses.

Norman's attack on Vlasak's valuation is basically two-pronged. He contends that, with respect to the discounted cash flow analysis, Vlasak's upward adjustment to net income after considering Heitman compensation levels was a legally impermissible technique. He also contends that various aspects of Vlasak's comparable company analysis were improper. We conclude that the trial court was warranted in accepting Vlasak's valuation testimony for three reasons.

First, as Kathryn notes, and as Norman concedes, Norman did not present any expert testimony or evidence of his own regarding Heitman's value. Thus, there was no counterevidence of value before the trial court. Second, Vlasak's opinion of Heitman's value, based on actual Heitman compensation, that is, excluding the compensation

add-back technique, would have been $17.4 million. Since Norman readily concedes in his brief that he would accept that valuation figure, he implicitly acknowledges and accepts the validity, except for the compensation add-back technique, of Vlasak's analysis. Norman's protestations in general, therefore, as to Vlasak's discounted cash flow or comparable company methodology, appear to be without merit. Third, the one arguably relevant case Norman cites in support of his argument that the compensation add-back technique is "legally impermissible" is distinguishable from the facts of this case.

Norman cites *Fehrs v. United States* (Ct. Cl. 1980), 620 F.2d 255, for the proposition that the technique utilized by Vlasak is legally impermissible. In *Fehrs*, the court addressed what it saw as a problem involved in comparing one company with others for valuation purposes. The court's concern stemmed from the fact:

> "[T]he expert *entirely avoided* the use of the Rental's own earnings as a basis for the application of the earnings multiplier in favor of a reconstructed earnings base *derived wholly* from the profitability levels of companies other than Rental. This, as the court sees it, is an approach that proceeds not by comparison but by substitution and, in the last analysis, represents the valuation of a non-existent company." (Emphasis added.) (*Fehrs*, 620 F.2d at 265.)

In his brief, Norman only provides us with the last sentence in the above-quoted material. He therefore fails to note that, while the expert in *Fehrs* entirely avoided the company's own earnings in favor of an earnings base derived wholly from the profitability levels of other companies, Vlasak did in fact consider Heitman's overall revenues, and his conclusion was based on a partial upward adjustment to net income. Since Vlasak's valuation was not derived solely from the compensation and profitability levels of the comparable companies, as was the case in *Fehrs*, we do not believe that that case compels a finding that the trial court erred in accepting Vlasak's methodology.

Regarding Heitman's valuation, the trial court stated as follows:

> *"Valuation of HFSL*
>
> I am persuaded that the discounted cash flow valuation methodology used by Gregory Vlasek [*sic*] is the appropriate method to value HFSL. He was criticized by Mr. Perlmutter for certain assumptions he made for determining the cash flow. I find, nevertheless, that he presented a convincing case for determining actual cash flow by making certain ad-

justments in the executive compensation structure. However, I also find, given Mr. Perlmutter's minority position in the company notwithstanding his so called veto power, that a discount rate greater than 10-15% is appropriate. I would select a 35% discount rate and by applying that to Mr. Vlasek's [*sic*] figures reach a value of approximately $4,420,000.00 for Mr. Perlmutter's interest in HFSL."

The valuation of property is a question of fact, and a trial court's determination of value will not be reversed unless it is contrary to the manifest weight of the evidence. (*In re Marriage of Wilder* (1983), 122 Ill. App. 3d 338, 349.) After taking into consideration the valuation evidence presented by Kathryn's expert, together with the fact that Norman did not present expert testimony or evidence to rebut Vlasak's methodology, we conclude that the trial court did not err in placing the value of Norman's interest in Heitman at $4,420,000.

■ Regarding the valuation of the New York Mayfair Regent Hotel, Norman contends that the value presented by Kathryn's expert, Christopher Kuehnle, was "legally flawed" because he used the wrong methodology, having utilized a comparable sales approach rather than an income approach based on the hotel's current business operations.

Kuehnle appraised the value of the New York hotel at $160 million. To reach this figure, he examined and analyzed sales of hotels having similar characteristics to the Mayfair Regent. Multiplying the number of rooms with this market data, Kuehnle arrived at a value of $160 million. As Kathryn correctly points out, this approach was approved in *Reynolds v. Coleman* (1988), 173 Ill. App. 3d 585, 596.

Norman's expert, Jules Marling, testified that in his opinion the New York hotel should be valued at $105 million. It is very interesting to note, however, that Marling utilized *both* a sales comparison approach, using many of the same comparable hotels as Kathryn's expert utilized in his analysis, and an income approach to arrive at this figure. It therefore seems odd, and even somewhat disingenuous, for Norman to argue now that the comparative sales methodology is "legally flawed."

We also note that Heitman's own valuation of the New York hotel, conducted in 1986 prior to the investment of $36 million in renovations, was $100 million. With this in mind, the trial court concluded as follows:

*"Valuation of New York Mayfair Regent*

Mr. Perlmutter's interest in the New York Mayfair Regent Hotel is found to be $6,350,000.00. I reject the methodology

employed by Mr. Marling. It defies reason to think that after $3[6],000.00 [*sic*] in renovations an asset valued by management at $100,000,000 prior to the renovations would increase in value by less than $4,000,000.00. I accept Mr. Kuehnle's theory that the hotel as one of a limited number of Deluxe New York hotels carries a trophy value. As with the HFSL I would apply a 35% discount rate to reach the value of Mr. Perlmutter's minority interest."

We agree with the trial court that it would be absurd to conclude that, if, as Heitman's own valuation estimate indicates, the hotel was worth $100 million prior to the renovation project, it would only appreciate by some $5 million after an infusion of $36 million in improvements. As it is for the trier of fact to determine conflict in the testimony of experts (*In re Marriage of Foley* (1987), 163 Ill. App. 3d 1, 9), the resolution of conflict between Kuehnle's testimony and that of Marling was within the purview of the trial court, and there was no error in placing the value of Norman's interest in the New York hotel at $6,350,000.

■ Norman's next contention is that the trial court erred when it found that the funds in various investment accounts were Kathryn's nonmarital property. In addressing this issue in its letter opinion, the trial court stated as follows:

"Kathryn Perlmutter has the following items of nonmarital property which are awarded to her:

a) Her investment accounts which contain funds clearly traceable to the proceeds of stock in the Finley Company which she received as a gift from her father. Certain deposits of marital funds were commingled with the nonmarital funds in the investment accounts. These deposits were transmuted to Mrs. Perlmutter's nonmarital property. Nevertheless $28,000.00 in deposits are clearly retraceable to the marital estate and reimbursement in that amount into the marital estate is warranted."

Norman concedes that the money Kathryn received in 1981 was nonmarital at the time of receipt. He maintains, however, that marital funds were subsequently commingled with the nonmarital funds and that, since Kathryn was unable at trial to "trace" which funds were nonmarital, they were transmuted into marital property. Norman relies primarily on *In re Marriage of Landfield* (1991), 209 Ill. App. 3d 678, and *In re Marriage of Davis* (1991), 215 Ill. App. 3d 763, in support of this argument.

Kathryn argues, and we agree, that Norman confuses the respective burdens that are imposed on the parties when commingling occurs. Section 503(c)(1) of the Act, which governs the commingling of marital and nonmarital property, provides in part that, "[w]hen marital and non-marital property are commingled by contributing one estate of property into another resulting in a loss of identity of the contributed property, the classification of the contributed property is transmuted to the estate receiving the contribution," subject to the reimbursement provisions of section 503(c)(2). (Ill. Rev. Stat. 1989, ch. 40, par. 503(c)(1).) Section 503(c)(2) provides, however, that no reimbursement is to be made if a contribution is not retraceable by clear and convincing evidence. Ill. Rev. Stat. 1989, ch. 40, par. 503(c)(2); *In re Marriage of Guntren* (1986), 141 Ill. App. 3d 1, 6.

Thus, according to the Act, if marital funds were contributed to and commingled with Kathryn's nonmarital funds, resulting in a loss of identity of the marital funds, the classification of the marital funds was transmuted to Kathryn's nonmarital estate, subject to the reimbursement provisions of section 503(c)(2). Thereafter, in order for the marital estate to be reimbursed for any contribution made to Kathryn's nonmarital estate, it became Norman's burden to trace, by clear and convincing evidence, the nature of those contributions. Ill. Rev. Stat. 1989, ch. 40, pars. 503(c)(1), (c)(2); *Guntren*, 141 Ill. App. 3d at 6.

Here, the trial court found that $28,000 in deposits were clearly traceable to the marital estate and ordered that the marital estate was therefore entitled to reimbursement in that amount. Although Norman alleges that other marital property was commingled with Kathryn's nonmarital funds, he offers no clear and convincing evidence of such contributions. This fact distinguishes the present situation from the cases cited by Norman, where specific amounts of marital property were traceable and determined to have been contributed to and commingled with the nonmarital estate. See *In re Marriage of Davis*, 215 Ill. App. 3d at 768-69; see also *In re Marriage of Landfield*, 209 Ill. App. 3d at 694.

This is essentially the procedure the trial court followed when it determined that the funds in the investment accounts were Kathryn's nonmarital property. While the court's use of the word "traceable" as it related to the identity of the stock proceeds was unfortunate, and probably led to Norman's confusion as to which party had the burden of tracing contributions, we believe that the ultimate conclusion reached by the trial court was correct.

■ Next, Norman argues that the trial court's decisions regarding the division of marital property and the award of child support were improper. Specifically, Norman contends that the trial court erred when it (1) included his 1990 bonus as part of his income for child support purposes but then awarded to Kathryn the account into which the bonus had been deposited; (2) ordered him to reimburse Kathryn for her condominium rental incurred in Snowmass, Colorado, during Christmas 1988; (3) ordered him to reimburse the marital estate for certain improvements to Norman's home in Highland Park; (4) failed to consider the tax consequences of its property distribution orders; and (5) ordered him to pay $12,000 per month, plus various other expenses, for child support of the parties' two minor children. Norman maintains that, as a result of the trial court's division of property, he will be rendered financially insolvent.

As stated above, we have already reversed some of the findings of the trial court with regard to its classification and distribution of assets. In light of that conclusion, "we do not believe that any purpose would be served by reviewing the propriety of the court's overall division of property." (*In re Marriage of Leisner* (1991), 219 Ill. App. 3d 752, 766.) In addition, since the division of marital property and the financial resources of the parents are among those factors to be considered in determining the amount of child support (Ill. Rev. Stat. 1989, ch. 40, par. 505(a)(2)), courts have stated that it is also advisable to "remand to the trial court all interrelated property and support issues once it has been determined that the property division was improper." (*In re Marriage of Wilson* (1982), 110 Ill. App. 3d 809, 815-16.) Therefore, as was the case in *Leisner* and *Wilson,* our reversal as to property classification and distribution necessarily will require the trial court to reexamine the overall division of property and the issue of child support in light of the adjusted financial resources of the parties. *Leisner,* 219 Ill. App. 3d at 766; *Wilson,* 110 Ill. App. 3d at 816.

■ Finally, Norman argues that he is entitled to a new trial on the ground that the trial court's rulings and conduct demonstrated extreme bias and prejudice against him, thereby denying him his right to a fair trial. Specifically, Norman contends that the following instances demonstrate the trial judge's bias and prejudice: (1) the court awarded judgment interest on $3,415,000 from September 12, 1990, although the September 12 judgment was not yet final and appealable due to the outstanding issues of attorney fees and sanctions; (2) the court's October 10, 1990, order, requiring Norman to assume the $1 million mortgage on the Snowmass residence, had the effect

of precluding Norman from obtaining *supersedeas* on that obligation; (3) that the court's conduct created uncertainty as to the appealability of the September 12 order and caused him to appeal prematurely; (4) the court required him to post an appeal bond to secure the $3,415,000 (later $2,415,000) nonfinal judgment; (5) the court failed to observe the rules of evidence or procedure at the hearing for attorney fees and sanctions; (6) the court erred in awarding sanctions; (7) the court allowed Norman only 14 days to post an additional bond of $55,000; and (8) the court failed to control improper actions and conduct by Kathryn's counsel at trial and instead praised Kathryn's counsel while criticizing Norman's counsel.

Kathryn responds, in part, to Norman's allegations of trial court prejudice by arguing that Norman has waived this issue for review by failing to raise the question of prejudice in the trial court. In this regard, Kathryn contends that, since Norman filed neither a motion for a new trial nor a motion for a change of venue alleging the trial court bias or prejudice, he cannot now raise the issue for the first time on appeal. Kathryn cites *McCormick v. McCormick* (1988), 180 Ill. App. 3d 184, and *Hollo v. Hollo* (1985), 131 Ill. App. 3d 119, in support of this position. In his reply brief, Norman maintains that all of the acts and circumstances that demonstrate the trial court's prejudice occurred after September 1990 and could not have been raised earlier and further that, pursuant to section 2—1203 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1203), post-trial motions are not required in bench trials. Norman does not address Kathryn's argument regarding motions for change of venue.

First, we disagree with Norman's contention that all of the alleged instances of trial court bias occurred subsequent to the court's September 12, 1990, order and could not, therefore, have been raised earlier. As stated above, Norman also alleges that the trial court's prejudice and bias was evidenced by its failure, *during trial*, to control supposedly improper actions by Kathryn's counsel. Moreover, while we agree initially with Norman's statement that post-trial motions are not mandated in bench trials (Ill. Rev. Stat. 1989, ch. 110, par. 2—1203), we also note that on September 19, 1990, Norman did in fact file a motion, pursuant to section 2—1203, asking the trial court to vacate its September 12 order due to confusion concerning the finality and appealability of that order, or to reconsider certain other findings. At no point in this motion, however, did Norman allege any instance of prejudice or bias.

We also agree with Kathryn's position that, if Norman believed the trial court was prejudiced against him, he should have requested

a change of venue on that basis. (See *McCormick*, 180 Ill. App. 3d at 191.) Section 2—1001 of the Code of Civil Procedure governs the procedural requirements for requesting a change of venue and provides, in part, as follows:

"(a) A change of venue in any civil action may be had in the following situations:

\*\*\*

(2) Where any party or his or her attorney fears that he or she will not receive a fair trial in the court in which the action is pending, because the inhabitants of the county are or the judge is prejudiced against him or her, or his or her attorney, or the adverse party has an undue influence over the minds of the inhabitants. In any such situation the venue shall not be changed except upon application, as provided herein, or by consent of the parties.

\*\*\*

(c) Every application for a change of venue by a party or his or her attorney shall be by petition, setting forth the cause of the application and praying a change of venue, which petition shall be verified by the affidavit of the applicant. A petition for change of venue shall not be granted unless it is presented before trial or hearing begins and before the judge to whom it is presented has ruled on any substantial issue in the case, but if any ground for such change of venue occurs thereafter, a petition for change of venue may be presented based upon such ground." Ill. Rev. Stat. 1989, ch. 110, par. 2—1001.

The right of a party to seek a change of venue on the ground of prejudice may be waived if not asserted at the appropriate time. (*McCormick*, 180 Ill. App. 3d at 192; *Hollo*, 131 Ill. App. 3d at 127-28.) Although the general rule is that a petition for change of venue is untimely if presented after the trial court has ruled on a substantive issue in the case, section 2—1001 does in fact allow for the situation where a ground for change of venue allegedly occurs after rulings have been made. (*McCormick*, 180 Ill. App. 3d at 192; Ill. Rev. Stat. 1989, ch. 110, par. 2—1001(c).) In this case, it is not disputed that Norman never requested a change of venue on the basis of trial court bias or prejudice. Accordingly, based on *McCormick* and *Hollo*, we conclude that the issue of the trial court's alleged prejudice and bias has been waived for review.

We also agree that, even if the issue of prejudice had not been waived, the trial judge's conduct did not deprive Norman of a fair trial. As stated by the court in *McCormick*:

"It is well established that a trial judge is presumed to be impartial [citation] and relies only on proper evidence in reaching a determination on the merits. [Citation.] The burden of overcoming this presumption rests on the party making the charge of prejudice, who must present evidence of personal bias stemming from an extrajudicial source [citations] and evidence of prejudicial trial conduct [citation]. During a bench trial, a judge's comments are generally regarded as making explicit that which is implicit in the adverse ruling [citation], and the judge's subjective opinion as to what the evidence has demonstrated is insufficient to establish personal bias or to raise an inference of prejudice." (*McCormick*, 180 Ill. App. 3d at 194.) Moreover, this court has held that allegations that a judge has made erroneous rulings against a party are not allegations of personal prejudice. (*Palmisano v. Connell* (1989), 179 Ill. App. 3d 1089, 1096; see also *McCormick*, 180 Ill. App. 3d at 194.) Rather, a demonstration of actual prejudice is required. *In re Marriage of Click* (1988), 169 Ill. App. 3d 48, 53.

In his brief, Norman states that the trial court "appears to have intended to sanction Norman from the outset and the September 12 judgment interest award is simply an additional sanction" and that the trial court "appeared to be focused only upon the end result of sanctioning Norman without regard to legal procedure or Norman's rights." Norman cites no authority for the proposition that this suspected prejudice on the part of the trial judge can serve as the basis for a new trial. In fact, the only case Norman cites for the proposition that he did not receive a fair trial due to prejudice is *People v. Eckert* (1990), 194 Ill. App. 3d 667. In *Eckert* the court stated that the "trial judge's remarks not only conveyed an impression *to the jury* that he felt defense counsel was not doing his job properly, but also that the defense was wasting the court's time." (Emphasis added.) (*Eckert*, 194 Ill. App. 3d at 674.) *Eckert*, concerning as it did a judge's conduct in the presence of a jury, is clearly inapposite to the facts of this case, where a bench trial was conducted. Based on our review of the record, we cannot conclude on the basis of the trial court's comments, conduct or rulings that Norman was deprived of a fair and impartial trial.

In addition, as was the case with the division of property and child support issues, our reversal as to property classification and distribution will also require the trial court to reexamine the issue of attorney fees in light of any adjusted financial resources of the parties. (*In re Marriage of Thacker* (1989), 185 Ill. App. 3d 465, 470.)

We feel similarly disposed concerning the issue of judgment interest. This is so because the trial court's award to Kathryn of $3,415,000, later reduced to $2,415,000, and judgment interest thereon, was made in order "to provide [Kathryn] with the balance of her share of marital property." Since our reversal as to the classification of certain marital property necessarily affects the total amount of such property to be distributed, reexamination of these issues is also required.

For all of the foregoing reasons, we affirm in part and reverse in part the judgment of the circuit court of Lake County and remand for further proceedings not inconsistent with the views expressed in this opinion.

Affirmed in part; reversed in part and remanded.

DUNN and UNVERZAGT, JJ., concur.